UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA    )    No. 1:CR-00-274
)
v.    )
)    (JUDGE CALDWELL)
ANTONIO L. HORNE,    )
)
Defendant/Petitioner.    )    (ELECTRONICALLY FILED)


EXHIBITS TO UNITED STATES' RESPONSE TO PETITIONER'S
MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255


THOMAS A. MARINO
UNITED STATES ATTORNEY

JAMES T. CLANCY
ASSISTANT U.S. ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .
UNITED STATES OF AMERICA, .
             Plaintiff       .
                          . Criminal No. 00-CR-274
        vs.                  .
                             .
ANTONIO L. HORNE, SR.,       .
             Defendant       .
. . . . . . . . . . . . . .


**TRANSCRIPT OF PROCEEDINGS**


        Before:   HON. WILLIAM W. CALDWELL

        Date  :   January 10, 2001; 9:30 a.m.

        Place :   Federal Building
                  Courtroom No. 1, 9th Floor
                  Harrisburg, Pennsylvania

        By    :   Susan D. Kashmere, RPR
                  Reporter - Notary Public



APPEARANCES:

        U.S. ATTORNEY'S OFFICE
        By:  JAMES T. CLANCY, ASSISTANT U.S. ATTORNEY

             For - Plaintiff

        PUBLIC DEFENDER'S OFFICE
        By:  L. REX BICKLEY, ESQ.

             For - Defendant

2

# I N D E X
## WITNESSES

For Plaintiff:

| SUSAN J. CROUSER | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Mr. Clancy | 4 | | | |
| By Mr. Bickley | | 7 | | |
| TIMOTHY WASIELEWSKI | | | | |
| By Mr. Clancy | 9 | | | |
| By Mr. Bickley | | 14 | | |
| ANGEL GONZALEZ | | | | |
| By Mr. Clancy | 18 | | 42 | |
| By Mr. Bickley | | 25 | | 45 |

## EXHIBITS

| Government's Exhibit Numbers | | Page |
|---|---|---|
| 1 | Consent to Search Form | 22 |

| Defendant's Exhibit Numbers | | Page |
|---|---|---|
| 1 | Criminal Complaint prepared by Timothy Wasielewski dated 10/12/95 | 17 |
| 2 | Criminal complaint prepared by Angel Gonzalez dated 2/17/96 | 33 |
| 3 | Harrisburg Bureau of Police Waiver of Rights dated 8/15/00 | 52 |

3

1           MR. BICKLEY:  Good morning, Your Honor.

2           MR. CLANCY:  Good morning, Your Honor.

3      Before the Court this morning is United States

4      of America versus Antonio L. Horne.  It is

5      docketed to --

6           THE COURT:  You can sit down.

7           MR. CLANCY:  It is docketed to Criminal

8      Number 1:CR-00-274.  Mr. Horn was indicted in

9      October and charged with being a convicted

10     felon in possession of a firearm.

11          The defendant has filed several pretrial

12     motions, some of which request the suppression

13     of certain statements and evidence.  This is

14     the time and the place the Court has set for a

15     hearing on that motion or those motions which

16     request suppression.  The United States is

17     prepared to proceed.

18          THE COURT:  Okay, we'll go right ahead

19     then.

20          MR. CLANCY:  Your Honor, the United States

21     calls its first witness, Officer Susan Crouser.

22          MR. BICKLEY:  Your Honor, for purposes of

23     this hearing we are prepared to stipulate in

24     order to expedite this -- it's, of course, up

25     to the Court -- stipulate that an event

4

1        occurred -- it's my understanding that Officer

2        Crouser is going to testify to an event which

3        occurred on October 6th which caused the

4        Harrisburg Police to investigate a matter and

5        then seek a warrant.  We're prepared to

6        stipulate to that.

7              MR. CLANCY:  Your Honor, one of the

8        contentions made in the defendant's motion is

9        that the stop that occurred was unlawful.  I

10       believe it would be appropriate for the Court

11       to hear Officer Crouser's brief testimony about

12       the information that she gathered in the

13       investigation which led to the stop.

14             THE COURT:  Okay.  I'll let you try your

15       case.  Mr. Bickley has agreed to stipulate to

16       anything that you think will expedite this.

17       With that understanding we'll go ahead.

18             **SUSAN J. CROUSER,** called as a witness,

19       being duly sworn, testified as follows:

20             THE CLERK:  Would you state for the

21       record, ma'am, your full name and spell your

22       last name, please?

23   A.    Susan J. Crouser, C-r-o-u-s-e-r.

24                    **DIRECT EXAMINATION**

25   BY MR. CLANCY:

1   Q.   Officer Crouser, where do you work?

2   A.   Harrisburg City Police Department.

3   Q.   How long have you worked for Harrisburg Police?

4   A.   Ten years.

5   Q.   Were you involved back in October of 1995 in an

6        investigation regarding a person named Antonio

7        Horne?

8   A.   Yes, I was.

9   Q.   Do you recall that investigation?

10  A.   Yes, I do.

11  Q.   Can you tell the Court, please, how you became

12       involved in it?

13  A.   We were called to an address on Rumson Drive in

14       the city for a domestic dispute involving a

15       gun, firearm.

16           Upon our arrival I spoke to a Ruth

17       Rodriguez, who stated that she was the victim

18       of a domestic assault involving the defendant,

19       that he came home in the middle of the night --

20       we were called there about 1:30 in the morning

21       -- and got her out of bed, dragged her down the

22       stairs, repeatedly threatened her with a gun,

23       struck her in the forehead with the butt of the

24       gun, pointed the gun to her head, pulled the

25       trigger several times and also chased her

Direct/Clancy - Crouser                    6

1    children up the steps, smacked them a couple

2    times.

3  Q.   Officer, you referred to the time of 1:30 in

4    the morning.  Was that on the date of October

5    7, 1995?

6  A.   Yes, it was.

7  Q.   Did Miss Rodriguez appear to you to have any

8    injuries consistent with the story she was

9    telling you about being beaten with a gun?

10  A.   Yeah, she had a large lump with a laceration on

11    her forehead.

12  Q.   You said that she told you the trigger was

13    pulled several times.  Do you have any idea

14    what happened when the trigger was pulled?

15  A.   Nothing.  It clicked.

16  Q.   Did she tell you who had committed this act

17    upon her?

18  A.   Yes, Mr. Antonio Horne.

19  Q.   Was Mr. Horne at the residence while you were

20    there?

21  A.   No, he was not.  He had left.

22  Q.   What did you do from that point in your efforts

23    to find Mr. Horne?

24  A.   We had sent out a countywide BOLO to watch out

25    for Mr. Horne's van.

Direct/Clancy - Crouser                    7

1    Q.    What does BOLO mean?

2    A.    Be on the lookout for.

3    Q.    Is it your understanding that that be on the

4          lookout was dispatched countywide to all police

5          and law enforcement agencies?

6    A.    Yes.

7          MR. CLANCY:   Those are all the questions I

8          have for Officer Crouser.

9                         **CROSS EXAMINATION**

10   BY MR. BICKLEY:

11   Q.    Officer Crouser, you indicated that you came

12         out at 1:30, is that correct, approximately?

13   A.    Approximately, yes, sir.

14   Q.    And did you seek a warrant -- did you request a

15         warrant at any time?

16   A.    Yes, I did.   As soon as I cleared and left the

17         residence I went and did the paperwork and had

18         the warrant, complaint drawn up.   So it was

19         sitting there on the desk.

20   Q.    But you didn't obtain the warrant, though.   Is

21         that correct?

22   A.    I drew up the complaint to have it signed by a

23         judge.   You know, it becomes a warrant, but

24         when the person is picked up, then the judge

25         comes and signs it, takes care of it.   It's

Cross/Bickley - Crouser                8

1    signed by me.

2   Q.   Do you recall when the warrant was actually

3        signed by the judge?

4   A.   No, I don't.

5            MR. BICKLEY:   That's all I have, Judge.

6            THE COURT:   Thank you.

7            MR. CLANCY:   Your Honor, I have a

8        follow-up question for Officer Crouser.

9                     **REDIRECT EXAMINATION**

10   BY MR. CLANCY:

11   Q.   You said a warrant was sought.  Did you make

12        any determination about whether the gun that

13        Miss Rodriguez told you about was still in the

14        house?

15   A.   I really don't remember.  I drew up assault

16        charges.  So I don't remember if she had said

17        he had the gun with him or if it was still in

18        the house.

19   Q.   Do you recall whether the BOLO that went out --

20   A.   Yes, that did go out as be on the lookout for

21        him because it was a domestic --

22            THE COURT:   I don't think the question had

23        been finished yet.

24   BY MR. CLANCY:

25   Q.   Do you recall whether the BOLO went out making

Redirect/Clancy - Crouser                    9

1              reference to the possibility of the suspect

2              having a gun?

3        A.    Yes, it did.

4                   MR. CLANCY:   That's all I have.   Thank

5              you.

6                   THE COURT:   I think that's all.   Thank

7              you.

8                   MR. CLANCY:   Your Honor, the United States

9              next calls Timothy Wasielewski to the stand.

10                  **TIMOTHY WASIELEWSKI,** called as a witness,

11             being duly sworn, testified as follows:

12                  THE CLERK:   Would you state for the

13             record, sir, your full name, please, and spell

14             your last name, please?

15       A.    My name is Tim Wasielewski,

16             W-a-s-i-e-l-e-w-s-k-i.

17                  THE CLERK:   Thank you.

18                       **DIRECT EXAMINATION**

19       BY MR. CLANCY:

20       Q.    Mr. Wasielewski, where do you work now?

21       A.    I'm employed as a house parent with Milton

22             Hershey School.

23       Q.    How long have you been doing that?

24       A.    A year and a half.

25       Q.    What was your job before you became a house

Direct/Clancy - Wasielewski                    10

1                parent at Milton Hershey?

2    A.    I was a police officer with Swatara Township

3          Police Department for 12 years.

4    Q.    Were you employed as an officer for Swatara

5          Township back in the time frame of October,

6          1995?

7    A.    Yes, I was.

8    Q.    Do you recall being involved around that time

9          period in an investigation regarding Antonio

10         Horne?

11   A.    Yes, I do.

12   Q.    How is it that you recall that, Mr.

13         Wasielewski?

14   A.    During that particular morning we were at roll

15         call and I specifically remember the BOLO being

16         given out about this incident and it involving

17         a handgun.  Those types of incidents usually

18         stick in a police officer's mind and that's

19         something I remember.

20   Q.    And you referred to this particular date.  As

21         best you recall and from reviewing your

22         reports, was that date October 7th, 1995?

23   A.    Yes.

24   Q.    What did you do upon hearing this BOLO being

25         transmitted over the radio?

Direct/Clancy - Wasielewski        11

A.   Well, that morning we were at roll call and the
     BOLO was given out.  Some Lower Paxton officers
     over in the area of Route 22 by I believe it's
     South Houcks Road, there was a bank over there,
     they came into contact with this white van with
     some lettering on the side of it.  There was
     some conversation between them and the
     dispatchers about this possibly being the
     vehicle that was being looked for by the city.

          The vehicle started to leave the scene of
     the bank and a Lower Paxton officer began to
     follow it.  As we were continuing to listen the
     vehicle proceeded to come I guess it was
     westbound on Route 22 there towards the
     interstate and started to go southbound on 83.
     And, naturally, we started to listen closely
     because that was coming towards our
     jurisdiction.  Swatara Township is located to
     the south of Lower Paxton Township.

          And the vehicle continued to keep coming
     our way and we got out into the parking lot to
     enter our patrol cars and headed up toward the
     area of 83 where it was coming into the
     interchange, the Eisenhower interchange there,
     just continued to listen to the radio and the

Direct/Clancy - Wasielewski        12

1       vehicle did, indeed, come down into Swatara

2       Township on Eisenhower Boulevard.  It was a

3       white van.  When it came into our jurisdiction

4       I got in behind it and pulled it over.

5   Q.  After you pulled the vehicle over what did you

6       do?

7   A.  After I pulled the vehicle over we had Mr.

8       Horne get out of the vehicle and he was taken

9       into custody.

10  Q.  How did Mr. Horne react to being pulled over by

11      you?

12  A.  He was cooperative.  He listened to everything

13      that we asked him to do.  He was cooperative.

14  Q.  Did you have any problem gaining identification

15      from him?

16  A.  No, he told us who he was.

17  Q.  When you placed him under arrest what happened

18      to the van?

19  A.  The van was impounded by the Harrisburg City

20      Police Department and I believe one of our

21      officers stayed at the scene until the tow

22      truck showed up to take the van.

23  Q.  Did you go back to the Harrisburg Police

24      Department?

25  A.  Yes, I did.

Direct/Clancy - Wasielewski          13

1   Q.   Did you have further contact with Mr. Horne

2        when you were back at the Harrisburg Police?

3   A.   Yes, I did.  What happened was in my contact

4        with him I noticed there was a strong odor of

5        an alcoholic beverage coming from his person

6        and his breath.  His eyes were real bloodshot

7        and he was somewhat thick-tongued.  I believed

8        he might possibly be under the influence of an

9        alcoholic beverage.  I indicated that to the

10       officers on the scene there and stated I was

11       going to ask him to do a Breathalyzer test back

12       at their station.

13            THE COURT:  At what station?

14   A.   At the Harrisburg Police station.

15            THE COURT:  That's where you were?

16   A.   That's where we were going, yes, sir.

17            THE COURT:  Oh, you were going, you hadn't

18       gotten there yet?

19   A.   Yes, sir.

20   BY MR. CLANCY:

21   Q.   When you got back to the Harrisburg Police did

22       you, in fact, request him to submit to a

23       Breathalyzer test?

24   A.   Yes, I did.

25   Q.   Did he agree to do that?

Direct/Clancy - Wasielewski          14

1   A.   No, he refused to take the test.

2   Q.   After he refused what did you do?

3   A.   I left.  I told him he was going to receive a

4        summons for the DUI charge because in the

5        course of my investigation I found that his

6        driver's license was suspended, told him that

7        he would receive that charge, as well as a DUI

8        charge and I left.

9   Q.   You referred to hearing the BOLO call during

10       your roll call on the morning of October 7th,

11       1995.  About what time did you have roll call

12       that morning?

13  A.   We always reported for morning roll call at ten

14       till 8:00.  So it would have been 7:50 a.m..

15            MR. CLANCY:  Those are all the questions I

16       have for Mr. Wasielewski.

17            THE COURT:  Okay.

18                   **CROSS EXAMINATION**

19  BY MR. BICKLEY:

20  Q.   Officer Wasielewski, it seems to me from your

21       testimony the basis for stopping him was the

22       BOLO and that's it.  Is that correct?

23  A.   That's correct.

24  Q.   Why was the vehicle towed to the Harrisburg

25       Police Department?

Cross/Bickley - Wasielewski                15

1  A.  It was part of their investigation into the

2      incident that occurred in the city.

3  Q.  So you were directed by them to take it

4      downtown or have it taken downtown?

5  A.  Our department didn't impound it.  Harrisburg

6      City Police Department did.

7  Q.  About what time did you arrive downtown to the

8      police department, about?

9  A.  I can't really say for sure.  Probably

10     somewhere around 9:00 a.m., maybe a little bit

11     after.  I don't really remember.

12 Q.  And about what time, and, again, I understand

13     this was several years ago, about what time did

14     you ask the defendant to undergo a Breathalyzer

15     examination?

16 A.  It would have been shortly thereafter.

17 Q.  And he refused?

18 A.  That's correct.

19 Q.  Did he ask to speak with an attorney at that

20     time?

21 A.  I don't recall.

22 Q.  He could have, though?

23 A.  It's possible.  I don't remember.

24 Q.  Who else was in the -- was there a videotape of

25     this at this time?

Cross/Bickley - Wasielewski        16

1    A.    There normally is a videotape machine there.  I

2          can't remember if I started the tape that

3          morning or if it was not working, but that is

4          the normal procedure, yes.

5    Q.    So there could be a videotape of this?

6    A.    There may be.

7    Q.    And who would have that?

8    A.    The district attorney's office.

9    Q.    You subsequently completed a warrant -- excuse

10         me, a complaint, criminal complaint regarding

11         the DUI related charges.  Is that correct?

12   A.    That's correct.

13   Q.    In that complaint did you attach an affidavit

14         of probable cause?

15   A.    I'm pretty sure that I did.  I don't remember

16         if I did, but I'm pretty sure.  That was

17         normally what I would do.

18             MR. BICKLEY:  The Court's indulgence for a

19         minute.

20             (Pause)

21             MR. BICKLEY:  Your Honor, may I approach?

22             THE COURT:  Yes.

23   BY MR. BICKLEY:

24   Q.    Would you kindly take a look at that document?

25             Did you get a chance to take a look at

Cross/Bickley - Wasielewski        17

1        that, Officer Wasielewski?

2    A.    Yes, I have.

3    Q.    Is that the complete complaint that you filed?

4    A.    Yes, it is.  There's no affidavit of probable

5          cause attached to it, but this is the criminal

6          complaint.

7    Q.    So it's possible that there wasn't an affidavit

8          of probable cause?

9    A.    It's possible.  I don't remember if I filed one

10         or not.

11             MR. BICKLEY:  Could we kindly mark that,

12         Your Honor?

13             **(Defendant's Exhibit Number 1 marked for**

14             **identification.)**

15   BY MR. BICKLEY:

16   Q.    Do you recall what was the outcome of the DUI

17         complaint filed against the defendant?

18   A.    It went to a preliminary hearing in front of

19         District Justice Yanick's office.  He found a

20         prima facie case and the case was sent to

21         Dauphin County Court.

22             Sometime after that I went to Dauphin

23         County Court in reference to the case in front

24         of Judge Lawrence Clark.  I did not know until

25         yesterday what the outcome of that was.  When I

Cross/Bickley - Wasielewski          18

1      spoke with U.S. Attorney Clancy he informed me

2      that that charge was dismissed.

3    Q.   So you have no recollection that it was

4      dismissed for lack of probable cause at the

5      outset?

6    A.   No, I did not know what had happened.

7          MR. BICKLEY:   That's all I have.

8          THE COURT:   Thank you.   That's all, Mr.

9      Clancy?

10          MR. CLANCY:   Nothing further, Your Honor.

11      Your Honor, the United States calls Officer

12      Angel Gonzalez to the stand.

13          **ANGEL GONZALEZ,** called as a witness, being

14      duly sworn, testified as follows:

15          THE CLERK:   Would you state your full name

16      for the record, please, and spell your last

17      name, please?

18    A.   My name is Angel M. Gonzalez, G-o-n-z-a-l-e-z.

19          **DIRECT EXAMINATION**

20    BY MR. CLANCY:

21    Q.   Officer Gonzalez, where do you work?

22    A.   I work for the Harrisburg City Police

23      Department.

24    Q.   How long have you worked for Harrisburg City

25      Police?

Direct/Clancy - Gonzalez                    19

1    A.   17 years.

2    Q.   Were you involved in the investigation of

3         Antonio Horne back on October 7th of 1995?

4    A.   Yes, I was.

5    Q.   Can you tell the Court how you came to become

6         involved in the investigation that morning?

7    A.   On that day I was working the booking desk --

8         that's a booking room officer processing

9         prisoners in there -- at which time I was

10        informed by my supervisor that I was going to

11        handle the investigation.

12   Q.   Had you had anything to do with the matter

13        involving Mr. Horne up to that point?

14   A.   No.

15   Q.   What did you first do when Mr. Horne arrived at

16        the Harrisburg Police station?

17   A.   The first thing we do is obtain his property.

18        He's informed of his charges and he was

19        Mirandized by myself.

20   Q.   Now, do you remember actually giving him his

21        Miranda warnings that day?

22   A.   Yes, I do.

23   Q.   How is it that you remember that back in 1995?

24   A.   Because it was odd that a booking room officer

25        is going to handle a case.  You know, normally

Direct/Clancy - Gonzalez                    20

1       we don't handle the cases, I just process the

2       individual and someone else is the prosecuting

3       officer.

4   Q.  And you actually remember advising Mr. Horne,

5       this defendant, of his rights?

6   A.  Yes, because I use a card, a Miranda warning

7       card which I carry all the time and I read from

8       the card.

9   Q.  Did you read from that card to Mr. Horne?

10  A.  Yes, I did.

11  Q.  And what was the result of your advising him of

12      his Miranda rights?

13  A.  He indicated that he -- well, he acknowledged

14      that he understood his rights.

15  Q.  What was his demeanor at the time you were

16      reading him his rights from the advice of

17      rights card?

18  A.  He was calm.

19  Q.  Did it appear to you that he could understand

20      what you were telling him?

21  A.  Yes.

22  Q.  Did you ask him as part of giving him the

23      rights whether he would agree to talk to you?

24  A.  Yes, I did.

25  Q.  How did he respond to you?

Direct/Clancy - Gonzalez                    21

1   A.   He indicated yes.

2   Q.   What did you tell Mr. Horne about what was

3        going on with the investigation at that time?

4   A.   I indicated to him that his vehicle was being

5        towed for an investigatory purpose because we

6        believed that there was a weapon in the

7        vehicle.

8   Q.   What did he say to you at that point, if

9        anything?

10  A.   He informed me that there was a gun in there

11       and that the gun was behind his seat, behind

12       the driver's side seat.

13  Q.   Did he describe the gun to you at all or did he

14       tell you anything else about it?

15  A.   No.

16  Q.   Did he tell you why he had a gun?  Did you ask

17       him about that at all?

18  A.   He indicated to me -- this is Mr. Horne

19       informing me.  I never actually asked him why

20       the gun was there.  He informed me that the gun

21       was behind the seat, that he took the gun out

22       of the house after he had an argument with his

23       girlfriend.

24  Q.   Did he say anything to you about whose gun it

25       was?

Direct/Clancy - Gonzalez                22

1   A.   Yes.  He indicated also to me that he obtained

2        the gun from a friend of his, a Donald

3        Livingston, and that the gun was obtained for

4        his protection.

5   Q.   For whose protection?

6   A.   Mr. Horne's, for the house.

7   Q.   Did you at some point ask Mr. Horne for consent

8        to search the van?

9   A.   Yes, I did.

10  Q.   What did he tell you when you asked for that

11       consent?

12  A.   He verbally gave me permission, but I then went

13       and obtained a written form, a consent to

14       search for and I had him sign that form.

15            **(Government Exhibit Number 1 marked for**

16       **identification.)**

17  BY MR. CLANCY:

18  Q.   I'm going to ask you to look on the table there

19       in front of you.  Is there a document there

20       that's marked Government Exhibit 1?

21  A.   Yes.

22  Q.   Could you take a look at that and tell the

23       Court what it is, please?

24  A.   This is a consent to search form.  I recognize

25       my handwriting, also the signature of Mr. Horne

Direct/Clancy - Gonzalez                    23

1          and the witnessing officer John Green who

2          witnessed the signature.

3      Q.  Now, Officer, is that the original of the

4          consent form?

5      A.  No, this is a copy of the consent form, consent

6          to search form.

7      Q.  Does the original still exist?

8      A.  No, the item was microfilmed by the police

9          department.

10     Q.  Does that appear to you, though, to be an

11         accurate copy of the form that you presented to

12         Mr. Horne that morning and that he signed?

13     A.  Yes.

14             MR. CLANCY:  Your Honor, I move the

15         admission of Government Exhibit 1.

16             THE COURT:  Any objection?

17             MR. BICKLEY:  No.

18             THE COURT:  All right.  It's admitted.

19     BY MR. CLANCY:

20     Q.  Now, after Mr. Horne both verbally indicated to

21         you that you can search the van and he signed

22         that form did you, in fact, conduct a search of

23         his van?

24     A.  Well, I went outside into the mezzanine area,

25         at which time I ran into Officer Wideman, who's

Direct/Clancy - Gonzalez                    24

1         seated at the rear.  He was assigned to assist

2         me in the search of the vehicle.

3    Q.   After you ran into Officer Wideman did you then

4         search the van?

5    A.   Yes.

6    Q.   Did you find a firearm in the van?

7    A.   Yes.  We went into the vehicle.  The weapon was

8         exactly where Mr. Horne indicated, at the rear

9         or behind the driver's side seat and it was in

10        plain view.

11   Q.   It wasn't tucked underneath the seat at all?

12   A.   No.

13   Q.   How did you come to see the weapon in the van?

14   A.   What I first noticed when I looked in the

15        vehicle was a camouflage holster.  Upon taking

16        a closer look at the holster there was a gun in

17        the holster, a .357 magnum.

18   Q.   Did you remove the gun from the holster?

19   A.   Yes, to check to see if the weapon was loaded

20        or not.

21   Q.   Was it loaded?

22   A.   Yes, there were six rounds in that weapon.

23   Q.   Did you then render that weapon safe?

24   A.   Yes.

25   Q.   As a matter of policy, Officer, when a vehicle

Direct/Clancy - Gonzalez                25

1      is brought into the police department what is

2      done with it when it gets there?

3  A.  Well, when a vehicle is impounded the normal

4      procedure is to conduct an inventory of the

5      vehicle, that is, anything of value that's in

6      plain view we document.

7  Q.  Would you consider that .357 Smith and Wesson

8      an item of value?

9  A.  Yes.

10  Q.  If Mr. Horne, when you asked him if he would

11      consent to search, said no, you can't search my

12      van, under departmental procedure what would

13      you have done?

14  A.  We would have done an inventory of the vehicle,

15      because it was going to basically impound it.

16          MR. CLANCY:  May I have just a moment,

17      Your Honor?  (Pause)  Those are all the

18      questions I have at this point for Officer

19      Gonzalez.

20                **CROSS EXAMINATION**

21  BY MR. BICKLEY:

22  Q.  Officer Gonzalez, do you recall testifying at a

23      preliminary hearing on May 22nd, 1996 in the

24      office of District Justice Zozos regarding this

25      matter?

Cross/Bickley - Gonzalez                    26

1    A.    I believe so, yes.

2    Q.    So you do recall?

3    A.    I recall being there, yes.

4    Q.    And testifying?

5    A.    I'm not sure.

6    Q.    So you're not sure whether you --

7    A.    I believe I did, yes.

8    Q.    You did?

9    A.    Yeah.

10   Q.    Do you recall testifying that the defendant

11         signed a Miranda waiver?

12   A.    A Miranda waiver?

13   Q.    Yes.

14   A.    No, I didn't say he signed a Miranda waiver.

15   Q.    You didn't?

16   A.    Consent to search.  Not that I know of, the

17         Miranda waiver.

18             MR. BICKLEY:  The Court's indulgence just

19         a minute.

20   BY MR. BICKLEY:

21   Q.    Do you know offhand if the Harrisburg Police

22         Department does use a waiver of rights form in

23         these incidents?

24   A.    A waiver of rights form you normally use for

25         juveniles and when someone is taking a formal

Cross/Bickley - Gonzalez                27

1      statement.  It's not something that's normally

2      used by patrol officers.

3   Q.  Well, you were in the police department when

4      you were asked to conduct this investigation,

5      though.  Is that correct?

6   A.  Yes, to a certain extent.

7          MR. BICKLEY:  Your Honor, may I?

8          THE COURT:  Sure.

9   BY MR. BICKLEY:

10   Q.  Now, the person involved here has nothing to do

11      with this case, Officer Gonzalez, but is this

12      form familiar to you at all?

13   A.  Not really, because normally investigators,

14      which are detectives, use these forms for

15      consent to -- for waiver of rights and juvenile

16      detectives.  They're not something that's

17      normally used by patrol officers.

18          THE COURT:  You say it's not something

19      that is used?

20   A.  No, unless you're taking a formal statement

21      from someone or interrogating them.

22   BY MR. BICKLEY:

23   Q.  So your testimony is that you read off this

24      little card that you keep?

25   A.  Yes.

Cross/Bickley - Gonzalez                    28

1   Q.   And your testimony is that he understood what

2        you were telling him and he verbally --

3   A.   He verbally responded to me, yes.

4   Q.   And what did he say exactly?

5   A.   To the best of my recollection, either yeah or

6        yes.

7   Q.   I'm, once again, drawing your attention to the

8        preliminary hearing in which you testified in

9        response to the question:  And did he say that

10       he wished to speak to you or wish to waive

11       those rights?  Do you recall testifying:  He

12       didn't say if he waives his rights?

13  A.   Is that a question, sir?

14  Q.   Yes.

15  A.   I don't recall that.

16            MR. BICKLEY:  May I show this to the --

17            THE COURT:  Yes.

18  BY MR. BICKLEY:

19  Q.   (Handing).

20  A.   Where is the question at?

21  Q.   And did he say that he wished to speak to you

22       or wish to waive those rights?  Your response:

23       He didn't say if he waives his rights.  He

24       never -- he just started talking.

25  A.   No, he wouldn't have said something like that.

Cross/Bickley - Gonzalez                    29

1       He waived his rights.

2   Q.   So he didn't say that he --

3   A.   The remarks would be either yes or yeah when

4        someone asks someone that type of question.

5   Q.   But I guess my question is then he didn't

6        affirmatively say he waived his rights?

7   A.   Well, also on that form just above that I

8        indicate that he indicated yes, that he

9        understood his rights, just above that

10       question.

11  Q.   That's correct, he did say that.  But he didn't

12       say to you he wished to waive those rights,

13       though?

14  A.   No, he wouldn't say something -- well, no, he

15       never made that remark.

16            THE COURT:  He did say yes that he

17       understood the rights?

18  A.   Correct.

19            THE COURT:  That's what you've said.

20       Okay.

21  BY MR. BICKLEY:

22  Q.   And so as far as you know, he never made any

23       other affirmative statements that he wanted to

24       waive his rights?

25  A.   I basically went through my card that I carry

Cross/Bickley - Gonzalez                    30

1           with me and he replied to each question on the

2           card; one of them, also, you know, knowing

3           these rights do you wish to speak with me.  And

4           the response would be yes or yeah.  Normally

5           people don't answer I'm waiving my rights to

6           speak with you.  It's either yes or no is the

7           basic response to a question like that.

8    Q.     And he didn't sign any forms that he wished to

9           waive his rights?

10   A.     For that, no.

11   Q.     Now, you were here when Officer Wasielewski

12          testified about him being asked if he was

13          interested in taking -- or wished to take or

14          would be willing to take a Breathalyzer test.

15          Is that correct?  Were you there then?

16   A.     At the point that he was doing that, I don't

17          recall that part, because he would normally

18          take him to the back -- there's a little room

19          where you go to do the Breathalyzer, which is

20          still part of the booking room, but it's just

21          set off to the left, but I don't recall that.

22   Q.     Do you recall whether at that time or any other

23          time, for that matter, whether he expressed a

24          desire to speak to a lawyer?

25   A.     Mr. Horne?

Cross/Bickley - Gonzalez                    31

1    Q.    Yes.

2    A.    No.

3    Q.    But he could have?

4    A.    Yes.  You mean he could have asked that

5          question?  Yes, he could have asked the

6          question, but he never did.

7                THE COURT:  You're saying he didn't do it?

8    A.    No, he didn't do it.  I thought he meant, what

9          the attorney was saying, could he have asked a

10         question like that and I said, yeah, he could

11         have asked a question like that.

12               THE COURT:  I think what the attorney

13         meant was was it possible that he said he

14         wanted to see an attorney?

15   A.    Oh, no, he never made that statement that he

16         wanted an attorney.

17   BY MR. BICKLEY:

18   Q.    So you don't know whether he might have made

19         that statement to Officer Wasielewski?

20   A.    No, I wouldn't know that.  I wouldn't be there

21         with him.

22   Q.    Officer Gonzalez, with respect to the consent,

23         you could have obtained a warrant -- he was in

24         custody.  Is that correct?

25   A.    Yes.

Cross/Bickley - Gonzalez                32

1   Q.   And you could have obtained a warrant to search
2        the vehicle?

3   A.   A search warrant?

4   Q.   Yes.  You could have?  You had time?  He wasn't
5        going anywhere and the van wasn't going
6        anywhere, was it?

7   A.   Right.

8   Q.   But you didn't do that?

9   A.   No.

10  Q.   Did you tell the defendant that unless he
11       consented to the search of the van that you
12       were going to ultimately rip it up anyway?

13  A.   No.

14  Q.   Did you make any statements like that?

15  A.   No, sir.

16  Q.   You heard me ask Officer Wasielewski -- I think
17       it was Wasielewski -- whether a camera was
18       running during this investigation at the
19       Harrisburg Police station.  Do you recall
20       whether there was a video camera running at
21       this time?

22  A.   The cameras normally turn on as the procedure
23       for giving a DUI test at the police station,
24       when they make them walk a line and the
25       stagmus test, but I don't recall the camera

Cross/Bickley - Gonzalez                33

1           being turned on.

2     Q.    Could it have been turned on?

3     A.    Yes, because it's only done in the back room --

4           well, the room that sits off to the side.

5     Q.    I guess --

6     A.    And I wouldn't be able to see him do that.

7     Q.    During the period of time when you were

8           interviewing the defendant, though, you would

9           not -- are you saying that you wouldn't have

10          been in that room anyway, is that correct?

11    A.    Correct.

12    Q.    You were outside of the video room, in other

13          words, is that what you're saying?

14    A.    Right.

15    Q.    Were you the officer who completed the

16          complaint against the defendant?

17    A.    Not in reference to the charge of aggravated

18          assault.

19    Q.    For the firearm charge?

20    A.    Yes.

21              MR. BICKLEY:  Your Honor, may I?

22              THE COURT:  Yes.

23              **(Defendant's Exhibit Number 2 marked for**

24          **identification.)**

25    BY MR. BICKLEY:

Cross/Bickley - Gonzalez                34

1   Q.   Officer Gonzalez, I don't have a copy of the

2        original complaint.  This is a copy -- well,

3        let me ask you, could you identify that?

4   A.   Yes, this a criminal complaint.

5   Q.   Filed against the defendant?

6   A.   Mr. Antonio Horne, yes.

7   Q.   But that's not the original complaint, though,

8        is it?

9   A.   This is the refile.

10  Q.   Yes, that's correct.  But for all intents and

11       purposes, that's identical, maybe with the

12       exception of some dates, to the original

13       complaint filed against him that you filed, you

14       completed.  Is that a fair statement?

15  A.   Yes.

16  Q.   Is that the entire document?

17  A.   For me?

18  Q.   Yes, that you filed.

19  A.   For this date, yes.

20  Q.   And there was nothing else attached to it, no

21       probable cause affidavit or --

22  A.   Because this was on view, so I wouldn't do a

23       probable cause affidavit.

24  Q.   When you were conducting this investigation was

25       there any other officer present?

Cross/Bickley - Gonzalez                    35

1    A.    Officer Green was in the booking room in

2          reference to the booking process and Officer

3          Wideman was involved when I was doing the

4          search outside with the vehicle.

5    Q.    This complaint was originally filed when?

6    A.    What do you mean?

7    Q.    When was the original complaint that you

8          completed filed?

9    A.    You mean that complaint?

10   Q.    Well, the predecessor of this complaint.  This

11         was the refile.

12   A.    That was a refile.  That was done that same

13         day.

14   Q.    The same day, October 7th?

15   A.    He was charged that same day.

16   Q.    Right.  And with respect to this charge what

17         occurred after that?

18   A.    What do you mean, the first time?

19   Q.    When was there a preliminary hearing for that

20         charge, do you recall?

21   A.    I'd have to look at my notes real quick to

22         recall the date, the exact date.

23   Q.    Could you do that?

24   A.    Okay, yeah.  That was February the 17th, 1996.

25   Q.    No, I mean the original complaint.

Cross/Bickley - Gonzalez                    36

1   A.   On the original hearing?

2   Q.   Yes.

3   A.   I don't recall the original hearing date.

4   Q.   Was there a preliminary hearing date set for

5        October 17th, 1995 before District Justice

6        Marsha Stewart?

7   A.   There may have been.  I don't recall that.

8   Q.   And do you recall that on that date the hearing

9        was postponed to November 27th, 1995?

10  A.   Oh, that the hearing was -- yes, it was

11       transferred to another judge.

12  Q.   And that judge was District Justice Zozos.  Is

13       that correct?

14  A.   Yes.

15  Q.   It was transferred to him on November 27th,

16       1995.  Is that correct?

17  A.   I don't recall the exact dates, but, yes, it

18       was transferred.

19  Q.   And the hearing was then continued until

20       December 19th.  Is that correct?

21  A.   I don't recall the dates.

22  Q.   To the extent of what you remember.

23  A.   The only thing I recollect is that the initial

24       hearing was sent to Zozos because Judge Stewart

25       knew either Mr. Horne or his family.  So

1        conflict there, so she had it transferred to

2        his office.  And the next thing I know there

3        was a hearing that was dismissed on February

4        the 17th.

5   Q.   Well, the hearing before District Justice Zozos

6        was on December 19th.  Do you recall that that

7        was continued because you failed to appear?

8   A.   No, I don't recall.

9   Q.   Is that possible?

10   A.   Well, during a certain time period -- I don't

11        remember the exact date -- I had an injury

12        where my back was herniated.  I have a

13        herniated disc.  And I was out of work for some

14        time.

15   Q.   Do you recall then -- and I understand that

16        these are just dates all mushed together,

17        especially after five years, but do you recall

18        that the hearing was then continued to January

19        3rd, 1996?

20   A.   To when, to December --

21   Q.   January 3rd, 1996.

22   A.   I don't recall the exact dates, but I do

23        remember now that I was -- my back did go out,

24        because the date that the hearing was dismissed

25        I was working in the booking room.  So during

Cross/Bickley - Gonzalez                38

1      that time period I was suffering from a

2      herniated disc.

3    Q.   So there could have been a hearing date set for

4         January 3rd?

5    A.   Yes, but I would have never been able to go.

6    Q.   And do you recall whether that was continued

7         for a third time because you failed to appear?

8    A.   I don't recall dates.

9    Q.   But that could have been the case?

10   A.   There could have been a hearing that day, but I

11        wouldn't have gotten the subpoena being that I

12        was injured.

13   Q.   And that it was continued to February 14th, at

14        which point the charge was dismissed.  Is that

15        correct?

16             THE COURT:  Which charge are you talking

17        about?

18             MR. BICKLEY:  The firearm charge, Your

19        Honor.

20   A.   I don't have the exact date that it was

21        dismissed.  I believe the date was February the

22        17th.

23             THE COURT:  That's close enough.

24   A.   I'm, you know --

25   BY MR. BICKLEY:

Cross/Bickley - Gonzalez                    39

1    Q.    And do you recall why it was dismissed?

2    A.    Well, the reason why it was dismissed is

3          because I was informed by Officer Fantasky, who

4          is retired now, that due to an error from the

5          subpoena the case was going to be rescheduled.

6          And that was the last thing that I was

7          informed.  The next thing I find out that the

8          case was dismissed.  I was available for the

9          hearing.  I was working as a report writer at

10         the police station, so I was available to go

11         there.

12   Q.    But it was dismissed because you didn't go,

13         though?

14   A.    Well, like I said, Officer Fantasky, who was up

15         at Zozos' office, informed me that there was an

16         error with the subpoenas and the case was going

17         to be rescheduled.  The next thing I found out

18         that it was dismissed because of me not being

19         there.

20   Q.    At that point what happened?

21   A.    Then I refiled the charge.

22   Q.    Were you directed to refile it?

23   A.    Well, I seek permission first to refile

24         charges.

25   Q.    And with whom did you speak?

Cross/Bickley - Gonzalez                40

1   A.   First I checked with my supervisor.  Then I --

2        we normally call the district attorney's office

3        to get permission to refile a charge.

4   Q.   And they gave you permission.  Is that correct?

5   A.   Yes.

6   Q.   So you refiled it?

7   A.   Yes, sir.

8   Q.   And the complaint that I showed you just five

9        minutes ago, that was the refiled complaint?

10  A.   Yes.

11  Q.   And subsequently the defendant was rearrested

12       on February 20th and arraigned before District

13       Justice Zozos.  Is that correct?

14  A.   I don't recall the date that he was arrested

15       because I don't believe I was part of that

16       arrest.

17  Q.   Do you recall whether a preliminary hearing was

18       scheduled for March 1st, 1996?

19  A.   There could have been.  I don't recall the

20       exact dates.

21  Q.   Do you recall that it was continued again until

22       April 18th?

23  A.   Of '96?

24  Q.   Yes.

25  A.   I don't recall that.

Cross/Bickley - Gonzalez                    41

1    Q.   But could it have been?

2    A.   Yes.  Like I said, during that time period I

3         was suffering from a herniated disc and I was

4         taken off of work for some time period.  For a

5         period of about three to six months I was not

6         at work.  So if any subpoenas came for me I

7         would not receive them.

8    Q.   Do you recall on April 18th, 1996, once again

9         -- several times again a continued hearing

10        date, it was again continued until May 22nd?

11   A.   I don't recall that.

12   Q.   Could have been?

13   A.   Possibly.

14   Q.   And on May 22nd a preliminary hearing finally

15        occurred.  Is that correct?

16   A.   I'm not sure of the exact date.

17             THE COURT:  I'm sure these are all matters

18        of record.

19             MR. BICKLEY:  Yes, Your Honor.

20   BY MR. BICKLEY:

21   Q.   Officer, are you reading from notes?

22   A.   No, sir.

23   Q.   You're not.  Do you have any notes reflecting

24        any of this?

25   A.   The only note that -- well, I have my reports

Cross/Bickley - Gonzalez                    42

1           here, but the only thing sitting on top is just

2           the report for the refile and that's it.

3     Q.    That's it?

4     A.    That's it.  That's the only thing that I can

5           see right there.

6                 THE COURT:  That's all he's looking at.

7           But you have other things in front of you

8           there, don't you?

9     A.    Yes.

10                MR. BICKLEY:  That's all I have, Judge.

11                THE COURT:  Thank you.

12                MR. CLANCY:  I have a few questions, Your

13          Honor.

14                      **REDIRECT EXAMINATION**

15    BY MR. CLANCY:

16    Q.    Officer, Mr. Bickley asked you about a form

17          that sometimes is used when Miranda rights are

18          waived.  Do you remember that?

19    A.    Yes.

20    Q.    Are you required to use that form in every

21          case?

22    A.    No.

23    Q.    Mr. Bickley showed you part of a transcript

24          from the preliminary hearing I take it?

25    A.    Yes.

Redirect/Clancy - Gonzalez                    43

1    Q.   And he showed you a part about when you

2         testified about having read Mr. Horne his

3         Miranda rights.  Do you recall that?

4    A.   Yes.

5    Q.   I'm trying to clarify that exchange.  Is it

6         fair to say that when you finished your

7         questions from your card Mr. Horne's last

8         response to you was yeah or yes and then he

9         just started talking?

10   A.   Yes.

11   Q.   Now, on the consent to search the van form, in

12        addition to having Mr. Horne sign that form did

13        you tell him that he did not have to sign the

14        form?

15   A.   I would have told him something like that.  You

16        have the right not to -- you know, you have the

17        right to an attorney.  You don't have to do

18        this.  You know, you always tell them.

19   Q.   I'm not talking about the Miranda rights.  I'm

20        talking about when you asked him if you could

21        search his van.

22   A.   Right.

23   Q.   You said you would have said something like

24        that.  What do you mean by that?

25   A.   Because they don't have to sign the form.  And

Redirect/Clancy - Gonzalez                44

1       that means that he doesn't have to consent to

2       the search.

3   Q.  Well, do you typically, as a matter of your

4       practice as an officer, tell people that?

5   A.  I stress the point in reference to their rights

6       to remain silent and their rights to an

7       attorney.

8   Q.  What about his right to refuse to consent to

9       search his vehicle?

10  A.  We read the form to them and, yes, I do inform

11      them that they have the right to refuse a

12      search.

13  Q.  Do you recall telling Mr. Horne that he could

14      refuse to consent to search?

15  A.  Yes.  He's the one that gave permission.  I

16      made a request and he said yes.

17  Q.  My question to you is do you recall telling him

18      that he did not have to consent to search?

19  A.  That's standard practice.

20  Q.  Mr. Bickley asked you about the possibility of

21      a video camera being turned on and you were

22      explaining about that room being a separate

23      part of the booking room.

24  A.  Right.

25  Q.  If someone refuses the Breathalyzer test is it

Redirect/Clancy - Gonzalez          45

1        typical that the video camera is turned on?

2   A.   No.

3   Q.   We just went through a pretty long chronology

4        of preliminary hearings and such.  I take it

5        that there was a period of time where you were

6        injured and not able to appear for court?

7   A.   Correct.

8   Q.   Is it also relatively common for there to be

9        logistical problems between subpoenas that are

10       said to have been issued out of a district

11       justice's office that you as the officer who is

12       supposed to testify don't actually receive?

13  A.   They have a practice of putting your subpoena

14       -- instead of giving you a subpoena, sending an

15       e-mail by computer, but if you're not working

16       you're not going to get the e-mail.

17            MR. CLANCY:  Those are all the questions I

18       have, Your Honor.

19            MR. BICKLEY:  Just a few, Your Honor.

20                 **RECROSS EXAMINATION**

21  BY MR. BICKLEY:

22  Q.   You indicated just moments ago that it was

23       standard practice to review the consent form

24       with the defendant.

25  A.   Yes.

Recross/Bickley - Gonzalez          46

1   Q.   Are you saying you recall specifically actually

2        doing that or are you saying that you think you

3        did it because it was standard?

4   A.   It's standard practice to read to them and to

5        let them know what you're doing.

6             THE COURT:  I think the officer does not

7        specifically recall doing it to Mr. Horne, but

8        that's standard practice.  Is that your answer?

9   A.   Yes.

10  BY MR. BICKLEY:

11  Q.   Now, this waiver of rights form, the Miranda

12       form, you're saying that that is not standard

13       practice.  Is that correct?

14  A.   It's only standard practice when you're taking

15       a formal statement or you're dealing with a

16       juvenile, but that's another form, but it's a

17       waiver form that's used.

18  Q.   You indicated at the beginning of your

19       testimony that it was unusual for you to be

20       doing this.  Is that correct?

21  A.   Right.

22  Q.   So this was not something you normally did.  Is

23       that correct?

24  A.   I am a police officer that's working the

25       streets.  That day I just happened to be

Recross/Bickley - Gonzalez        47

1          assigned to the booking desk and normally the

2          booking room officer doesn't deal with doing

3          the ICR and handling a case.  Normally we just

4          do the paperwork, process the individual and

5          that's the extent.

6    Q.   You referred to ICR.  That's an acronym?

7    A.   Initial crime report.

8    Q.   So what occurred that morning was not something

9          that you normally do then?

10   A.   Correct.

11   Q.   And just so I'm clear about this, and I know

12         that this may be somewhat redundant, you don't

13         recall Mr. Horne actually saying, yes, I waive

14         all my rights, I want to speak to you?

15   A.   He said yes after each question.

16   Q.   He didn't say, yes, I waive my rights and I

17         want to speak to you.  Is that correct?

18              THE COURT:  He said yes.

19   A.   He used the word yes.

20              THE COURT:  I think that's very clear now.

21         Thank you, Mr. Gonzalez.  I think you're

22         finished.

23              MR. CLANCY:  Your Honor, those are all the

24         witnesses the United States would call at this

25         point.  It rests its case.

```
                    Recross/Bickley - Gonzalez      48
 1          THE COURT: All right. Does the defense
 2     have any testimony?
 3          MR. BICKLEY: No, Your Honor.
 4          THE COURT: You do not?
 5          MR. BICKLEY: No.
 6          THE COURT: All right. Then we will
 7     conclude the testimony.
 8          MR. CLANCY: Your Honor, if I may, I note
 9     that Mr. Bickley has on behalf of Mr. Horne
10     filed several motions. With the record that we
11     will have from today's proceeding I would like
12     to file a brief in response to his motions.
13          My brief typically, based on the filing
14     date, would be due this Friday. I would
15     request, however, the ability to order the
16     transcript from this proceeding and a period of
17     14 days after receiving the transcript within
18     which to file the Government's responsive brief
19     and then, of course, Mr. Bickley would have a
20     reply brief to file.
21          I would note for the Court that because a
22     pretrial motion has been filed all of the time
23     that the motion is pending and under
24     consideration with a reasonable time for
25     disposition of the motion is excludable under
```

Recross/Bickley - Gonzalez          49

1     the Speedy Trial Act pursuant to 18 U.S.C. 3161

2     H(1)F.

3          THE COURT:  Mr. Bickley, do you want to

4     supplement your brief at all based on anything

5     that's occurred at the hearing today?

6          MR. BICKLEY:  Well, Your Honor, I would

7     like to, first of all, move for the admission

8     of our evidence, Your Honor.  I would like the

9     opportunity to supplement, and I don't have it

10    right now, Your Honor, supplement some things

11    that are a matter of record, including

12    transcripts and whatever else is a matter of

13    record and whatever else I can -- I think there

14    are some outstanding discovery issues, too.  I

15    would like the opportunity to supplement the

16    record and also perhaps respond to Mr. Clancy's

17    brief.

18         THE COURT:  You don't want to supplement

19    your brief at this point?

20         MR. BICKLEY:  Not my brief at this point.

21    I may wish to, though.

22         THE COURT:  Well, the reason I ask you

23    that question is because I think if you're

24    going to supplement your brief it should be

25    done before Mr. Clancy is required to file a

Recross/Bickley - Gonzalez          50

1    brief.

2         MR. BICKLEY:  At this point if I were to

3    -- well, the Court would give me what period of

4    time to do that, Your Honor?

5         THE COURT:  Well, Mr. Clancy would like to

6    have the transcript before he files his brief.

7    I didn't know whether that would be something

8    you --

9         MR. BICKLEY:  That would be helpful, Your

10   Honor, yes.

11        THE COURT:  Well, why don't we provide

12   then that you will supplement your brief within

13   10 days after the transcript is filed and then

14   we'll have the normal briefing periods for the

15   opposition and reply that are provided for in

16   our rules.

17        MR. BICKLEY:  Fair enough.

18        MR. CLANCY:  That would be fine with me,

19   Your Honor.

20        THE COURT:  And the other motions that you

21   filed you have filed a brief?

22        MR. BICKLEY:  Yes.

23        THE COURT:  And you have not responded

24   yet?

25        MR. CLANCY:  I have not, Your Honor.  It

Recross/Bickley - Gonzalez                51

1       would be my request to answer all of the

2       motions in one brief.

3               THE COURT:  I think that would be much

4       more efficient as well.  So we will grant you

5       an extension of time to respond to the other

6       pretrial motions that have been made and we'll

7       make that contemporaneous with your opposition

8       brief on the suppression hearing.

9               MR. CLANCY:  Thank you, Your Honor.  Your

10      Honor, I would also note that we currently are

11      still on the trial calendar for January 22nd.

12      With the pending motion I would simply suggest

13      that we remove the case from the trial calendar

14      to have it rescheduled for trial after the

15      motions are decided.

16              THE COURT:  I hadn't thought about that,

17      but that obviously appears to be necessary.

18              MR. BICKLEY:  Yes.  Your Honor, I guess,

19      just informationally, I would ask, and maybe

20      this Court doesn't know at this point, but

21      where does that place us ballpark on the trial

22      list?

23              THE COURT:  Well, until I dispose of the

24      motions I guess I can't set a date for trial,

25      but it would be within a very reasonable time

Recross/Bickley - Gonzalez                52

1    after I rule on the outstanding motions and as

2    soon as I can do it.  I'll admit all of the

3    exhibits that were referred to.

4            MR. CLANCY:  I believe that's all we have

5    this morning, Your Honor.

6            THE COURT:  I appreciate the efficient

7    manner in which this case was presented.  We'll

8    adjourn at this time.

9            THE CLERK:  Court is adjourned.

10           **(Defendant's Exhibit Number 3 marked for**

11   **identification.)**

12           (Whereupon, the hearing concluded at

13   10:35 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Recross/Bickley - Gonzalez                53

## CERTIFICATE

I hereby certify that the proceedings and
evidence are contained fully and accurately in
the notes taken by me on the within
proceedings, and that this copy is a correct
transcript of the same.

___2-26-01_____          _Susan D. Kashmere_
Date                          Susan D. Kashmere, RPR
                              Reporter, Notary Public

NOTARIAL SEAL
Susan D. Kashmere, Notary Public
City of Harrisburg, Dauphin County
My Commission Expires April 18, 2004

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA)         No. 1:CR-00-274
                        )
              v.         )        (JUDGE CALDWELL)
                        )
ANTONIO L. HORNE,        )
                        )        (ELECTRONICALLY FILED)
      Defendant/Petitioner.    )


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of November, 2004, she served a copy of the attached

EXHIBITS TO UNITED STATES' RESPONSE TO PETITIONER'S
MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255

via electronic filing and/or by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.


Antonio L. Horne, Sr.
41571-066, AK-3929
SCI Fayettee State Prison
50 Overlook Drive
LaBelle, PA 15450-9999

                          /s/ Carol A. Manies
                         CAROL A. MANIES
                         Legal Assistant